```
                                              FILED
       IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ALABAMA
                 MIDDLE DIVISION            99 APR 19 AM 9:11
                                            U.S. DISTRICT COURT
                                             N.D. OF ALABAMA
BETH DAVIS,                    }
                               }
     Plaintiff,                }
                               }    CIVIL ACTION NO.
v.                             }
                               }    97-AR-2225-M          ENTERED
SYNCRO CORPORATION,            }
                               }                          APR 19 1999
     Defendant.                }
```

**MEMORANDUM OPINION**

Presently before the court is a motion for summary judgment filed by defendant, Syncro Corporation ("Syncro"). Syncro seeks judgment as a matter of law on all claims of plaintiff, Beth Davis ("Davis"), for an alleged violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978. For the reasons stated herein, the motion is due to be denied in part and granted in part.

**Background**

Davis began her employment with Syncro on July 17, 1995. During her employment, Davis worked in Department 1400 and was trained on a number of machines used by that department in the process of making anti-lock brake sensors. The nature of employment in 1400 is such that employees rotate to various machines. On January 8, 1996, Davis was assigned to be trained on the lead solder machine. Davis noticed a warning label on a can of lead solder that read:

> WARNING: This product CONTAINS LEAD which may be harmful to your health and is a chemical known to the State of California to cause cancer, birth defects or other reproductive harm. Federal and State laws prohibit the use of lead solder in making joints in any private or public potable (drinking) water supply system. Breathing flux fumes may cause respiratory system irritation or damage. After handling solder, wash hands with soap and water before

smoking or eating.

Having recently learned that she was pregnant, Davis informed her supervisor, Denise Dobbins Acker ("Acker"), that she was not comfortable being trained on the lead solder machine. Acker reassigned Davis for the day and informed Davis that she would have to obtain a doctor's excuse. On January 9, 1996 Davis visited her doctor's office, explained the situation, and obtained a note from the doctor's nurse, which read:

> Our patient Beth Ann Davis is being followed in our office for pregnancy. Please allow Beth to work on a machine or area that does not have the potential for lead exposure. Thank you.

Davis returned to Syncro for her scheduled shift on January 9 and was not assigned to work on the soldering machine. Davis presented the note to Acker, who informed Davis that Syncro had a "no restrictions" work policy, meaning that it required all employees to work without restrictions, or take a medical leave until their respective restrictions were lifted. *Depo. of Acker*, at 73. Because of the obvious conflict between the note from Davis's doctor and Syncro's "no restrictions" policy, Acker instructed Davis to discuss the note with Ken Vest ("Vest"), Syncro's plant manager.

Vest was not available, so Davis spoke with Donna Collins ("Collins"), Syncro's personnel director. Collins read the note and interpreted the request that Davis be placed on a job that did not have the <u>potential</u> for lead exposure to preclude Davis from working at any job in the plant since all jobs at Syncro have the <u>potential</u> for lead exposure, though direct contact with lead occurs only in a few jobs. Collins informed Davis that Syncro could not allow her to work, given the doctor's restrictions. *Depo. of Collins*, at 26-27; *Depo. of Acker*, at 87. Collins suggested that Davis return to her doctor's office and have

2

the restrictions clarified, or, alternatively that Davis have her doctor provide an excuse stating that she was unable to work and take a medical leave. *Depo. of Collins*, at 35-36.

On January 10, 1996, Davis and Acker met with Ken Vest. Davis presented her doctor's excuse to Vest, who noted that it restricted Davis from jobs or areas that had the <u>potential</u> for lead exposure. Vest explained to Davis that because every department used lead solder, she had the potential for lead exposure by merely walking into the facility. *Depo. of Vest*, at 73; *Depo. of Pl*, at 79. Vest presented three options to Davis: (1) she could return to her doctor, have him lift the restrictions, and return to work, (2) she could obtain a note stating that she was unable to work and take a medical leave of absence, or (3) she could quit. *Depo. of Vest*, at 72. Davis rejected Vest's suggestion to take a medical leave[1] and she refused to quit. Shortly after stating that she should have her doctor modify her work restrictions, Vest told Davis that she could not work with <u>any</u> restrictions, that she must be released to do every job in the plant in order to work at Syncro. *Id*,

---

[1] In order to obtain medical leave, Syncro requires an employee to obtain a doctor's note stating that the employee is incapable of working. Davis rejected Vest's suggestion that she take medical leave for two reasons. First, Davis maintains that she was physically able to work and contends that her doctor therefore would not have written an excuse stating that she was not able to work. Second, Syncro's policy prohibits an employee's leave from exceeding the employee's length of service with Syncro. At the time of the events in question, Davis had been with Syncro only five and a half months. Davis's leave would have expired before she had her child, and under Syncro's policy, Davis would have been terminated had she not returned to work. Deposition testimony indicates that Acker, Davis's supervisor, implicitly proposed a modification of Syncro's policy, telling Davis that she could "go home for nine months." The deposition testimony provided in this case indicate that neither the plant manager nor the personnel director made no such statement and there is no evidence indicating that Acker had the authority to unilaterally change a term contained in the leave policy, nor is there evidence that Acker guaranteed Davis employment at the conclusion of her leave.

at 147; *Depo. of Pl.*, at 80. Davis contends, and defendants essentially concede that Vest, Acker, and Collins at various times told Davis that she was could not work if she could not do all the jobs. *Depo. of Pl.*, at 83.

The parties disagree as to how Davis's meeting with Vest concluded. Davis contends that she was fired after she stated that she would not return to her doctor's office to have her restrictions modified, explained that she could not take medical leave, and refused to quit. Davis testified that Vest explicitly told her that she was fired and that Acker escorted her from the plant. *Depo. of Pl.*, at 83, 85. Syncro disputes Davis's version of events. Syncro maintains that Vest and Acker were both under the impression that Davis left the meeting intending to have her doctor modify her restrictions, but that Davis never returned to work. Although it maintains that Davis voluntarily quit her employment, Syncro has assumed, for the purpose of its motion for summary judgment, that Davis was fired.

As a result of the events of January 8 - 10, Davis filed the instant action claiming that she was discriminated against because of her pregnancy, in violation of Title VII as amended by the Pregnancy Discrimination Act of 1978 ("the PDA"). Though her complaint contains only an argument based on disparate treatment, Davis's brief in opposition to Syncro's motion for summary judgment presents both disparate treatment and disparate impact theories of discrimination.

## Discussion

I. *Disparate Treatment*

Davis alleges Davis contends that Syncro applied its policy regarding work restrictions strictly to her, a pregnant woman, but

4

applied the policy more leniently to other non-pregnant employees who, for any number of reasons, were unable to perform all jobs at Syncro. Davis argues that manifestations of the alleged lenient treatment include not only decisions not to fire employees who had restrictions, but also affirmative efforts on the part of Syncro to contact doctors' offices on behalf of employees and to provide some type of accommodation to employees who were unable to perform all the jobs to which they were assigned.

Notwithstanding Davis's assertion to the contrary, the record contains no direct evidence of discrimination. Direct evidence is evidence, which if believed, proves the existence of the fact in issue without inference or presumption. *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir 1997). Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir. 1992). Davis has presented statements indicating that she was fired because of the restrictions imposed by her doctor, not statements that she was fired because she was pregnant. Davis argues that since her doctor imposed restrictions on her <u>because of</u> her pregnancy, and since she was fired <u>because of</u> these restrictions, she was fired <u>because of</u> her pregnancy. It is apparent that this argument requires a leap in logic taking it out of the realms of direct evidence. *See Burrell*, 125 F.3d at 1393.

Lacking direct evidence of discrimination, Davis must rely on circumstantial evidence to show that Syncro discriminated against her because of her pregnancy. A plaintiff relying on circumstantial, or indirect evidence to prove that she received different treatment than other, non-pregnant employees must employ the familiar burden shifting

5

framework used in all Title VII cases involving disparate treatment. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994). Under this framework, Davis must create an inference of discrimination by establishing a *prima facie* case. Syncro may rebut the inference of discrimination by setting forth a legitimate, non-discriminatory reason for its actions. If Davis can discredit Syncro's proffered reason by showing that it is only a pretext for discrimination, Davis can survive Syncro's motion for summary judgment.

To establish a *prima facie* case of discrimination, Davis must show (1) that she was a member of a protected class under Title VII; (2) that she was qualified for her position; (3) that she suffered an adverse employment action; and (4) that she suffered from differential application of work or disciplinary rules. *Armstrong*, 33 F.3d at 1314. Because the PDA amended Title VII's definition of "sex" to include pregnancy and pregnancy related medical conditions, Davis has satisfied the first element of her *prima facie* case. Syncro does not dispute that Davis was qualified for her position, and it has assumed for the purposes of its motion for summary judgment that Davis was fired, though this fact is otherwise in dispute. The second and third elements are therefore not a point of contention.

Syncro argues that Davis cannot establish a *prima facie* case of discrimination because she is unable to show that she suffered from differential application of work rules. Syncro explains that, at the time Davis was employed by Syncro, it had a policy prohibiting employees who had any type of restriction from working. Employees either had to work with no restrictions or had to take a leave of absence until they could return to work without restrictions. Syncro contends that it presented these options to Davis, as it does to any other employee. When

6

Davis refused to take medical leave, Vest, Collins, and Acker, all told Davis that she could not work at Syncro so long as she had to work with restrictions. Vest specifically told Davis that she could not work unless she could work all jobs to which she had been assigned. In its brief in support of its motion for summary judgment, Syncro boldly stated that "Davis cites no examples and *there are indeed no examples* of non-pregnant employees allowed to work with restrictions." (*Def.'s Br.* of 3-15-99, at 8) (emphasis supplied). If this were indeed true, Davis would have a difficult time establishing her *prima facie* case.

But Syncro itself provides the evidence that shows that it did not, in fact, apply its "no restrictions" work policy to every employee. Vest testified that, during the time in which the "no restriction" policy was in effect, Syncro employed an individual whose vision was impaired. Syncro provided this individual with extra lighting, allowed Safe State to provide additional accommodations, and did not require that employee to perform every job to which she had originally been assigned. *Depo. of Vest*, at 127-28. Additionally, Collins testified that while Syncro did have a "no restrictions" policy, it "tried to work with people" by moving an employee who could not work on a particular machine to a different machine. *Depo. of Collins*, at 21. This clearly suggests that Syncro attempted to assist at least some employees who had restrictions. Even Syncro's alternative defense, that it terminated[2] Davis because the restrictions imposed by her doctor were "too broad," suggests that the company does not apply its "no restrictions" policy across the board.

This evidence is sufficient evidence to show that Syncro did not

---

[2] Again, Syncro does not agree that it terminated Davis, but has only assumed this fact for the purposes of its motion for summary judgment.

7

apply its "no restrictions" work policy to at least one non-pregnant employee. In order to establish the fourth element of her *prima facie* case, however, Davis must also show that she did not receive the same lenient treatment and accommodations. With respect to accommodations, Davis argues that Syncro had a policy of contacting doctors' offices on behalf of employees who were receiving workers' compensation, but that no one from Syncro contacted her doctor's office to clarify the problematic restrictions. While it is true that Collins testified that she has contacted doctors offices regarding to some Syncro employees, the same testimony makes clear that the purpose of the contact was to obtain paperwork needed to process workers' compensation claims, not to obtain information about a particular employee's ability to work. *Depo. of Collins*, at 27-28. Syncro therefore had no obligation to contact Davis's doctor and clarify the restrictions he had placed on her ability to work.

Davis also contends that Syncro's failure to research the dangers of lead exposure and pregnancy, and failure to ascertain what, if any, precautions could alleviate some of the risk to her unborn child provide evidence of disparate treatment. Davis states in her brief that Syncro took such proactive measures with respect to other employees, but provides no _evidence_ of Syncro making efforts to obtain information about a particular employee's health concern. Davis makes much of Syncro's provision of additional lighting to the vision impaired employee and the fact that Syncro allowed Safe State to provide additional accommodations to her. Yet Davis presents no evidence to indicate that Syncro did this on its own, or whether the accommodation and Safe State's involvement was orchestrated by the employee. In short, Davis has presented only conclusory statements alleging disparate treatment in this regard -- not evidence.

With regard to the application of Syncro's "no restrictions" work policy, the facts become somewhat unclear. Notwithstanding the deposition testimony showing that Davis was told she would not be allowed to work with restrictions, all parties concede that Davis was asked to have her doctor's excuse modified, since, as written, the restriction prohibited Davis from working at *any* job in the plant. There would be no reason for Syncro to ask Davis to have the excuse modified unless Vest, Collins, and Acker could foresee some work restrictions that would be acceptable.

In essence, it appears that Syncro is talking out of both sides of its corporate mouth, so to speak. On the one hand, there are repeated requests for Davis to have the note modified, suggesting that Syncro would have applied the "no restrictions" rule leniently to Davis. On the other hand, the same people who asked Davis to have the note modified also told her that she could not work at Syncro so long as she has restrictions, suggesting that she would have received no lenient treatment. Significantly, Vest told Davis that she must be able to work every job *after* asking her to have the excuse modified. Davis may have felt that any modification of her doctors excuse would have been futile since she had been told that no restriction was acceptable. In light of Syncro's conflicting statements, is Davis to be faulted for not knowing which course of action Syncro would take?

Viewing the evidence in favor of Davis, as this court is required to do when considering a Rule 56 motion, the court concludes that Davis has presented sufficient evidence to create a genuine issue as to whether Syncro would have strictly enforced its "no restrictions" policy against her while affording other non-pregnant employees more lenient treatment. Davis has therefore presented sufficient evidence of a *prima facie* case

to survive a motion for summary judgment. The burden now shifts to Syncro to articulate a legitimate, non-discriminatory reason to rebut the inference of discrimination created by Davis's *prima facie* case.

Syncro attempts to rebut this inference in its reply brief. Acknowledging that it did provide some assistance to the vision impaired employee, Syncro argues that the different treatment can be explained by the fact that the vision impaired employee suffered from a permanent disability and that Syncro was therefore required, under the Americans with Disabilities Act ("the ADA"), to provide reasonable accommodations to that otherwise qualified employee. *Def. Reply*, at 2-3. This argument could effectively rebut the inference of discrimination[3] but for two flaws.

First, Syncro has provided no <u>evidence</u> that the vision impaired employee was, in fact, disabled under the ADA. Instead it offers only

---

[3] If the vision impaired employee was disabled under the ADA, this fact would provide adequate explanation for differential treatment. The PDA requires only that pregnant employees receive the same treatment as other non-pregnant employees. Because the analysis required for a claim under the PDA is the same type of analysis used in other Title VII discrimination actions, the relevant comparison in a PDA case is between the pregnant plaintiff and a non-pregnant employee who is similarly situated to the plaintiff in all relevant respects. See *Armstrong*, 33 F.3d at 1312-13 (Title VII analysis controls). In this case, if the vision impaired employee was ADA disabled, Davis would be similarly situated to that employee only if Davis herself was also ADA disabled at the time of her termination. Because pregnancy itself is not a disability under the ADA, Davis must present evidence that the medical conditions related to her pregnancy qualify as a disability, *i.e.* that her conditions significantly impacted a major life activity. See *White v. QMS, Inc.*, 1997 WL 827537, at *4 (S.D. Ala.), *vacated and remanded on other grounds*, No. 97-6940 (11th Cir. Jan. 28, 1999) (pregnancy is not a disability under the ADA); *Walsh v. Food Supply, Inc.* 1997 WL 401594, at *2 (M.D. Fla.) (same). Davis has presented no such evidence. In fact, Davis's repeated statements that she wanted to work and was physically capable of working suggest that Davis's condition would not have qualified as a disability under the ADA. Evidence that the vision impaired employee was ADA disabled could therefore have rebutted the inference of disparate treatment since Syncro merely would have been applying different rules to employees who were differently situated.

conclusory statements contained in its brief. *Def. Reply*, at 2-3. These statements are insufficient to satisfy Syncro's burden of production.

Second, even assuming that the vision impaired employee was ADA disabled, Syncro has presented no evidence to explain away Collins's statement that Syncro "tried to work with people." The sequence of questions in Collins' deposition testimony clearly indicates that Collins was not referring exclusively to physically handicapped individuals when explaining that Syncro attempts to accommodate its employees:

> A. At the time Ms. Davis left, we didn't have [employees working with] restrictions. We tried to work to work with people but - okay.
>
> Q. What do you mean when you say we tried to work with people?
>
> A. If there was a particular machine they couldn't work on or something like that, we would move them.
>
> Q. And I guess you're referring to couldn't work because of a physical problem, a physical handicap?
>
> A. **Perhaps**.

*Depo. of Collins*, at 21 (emphasis supplied).


II. *Disparate Impact*

Though not apparent in her complaint, Davis's brief in opposition to Syncro's summary judgment motion contains an argument based on the disparate impact theory of discrimination. Davis complains that Syncro's medical leave policy disparately impacts pregnant employees. The leave policy provides, in pertinent part, as follows:

> 1. Associate must be under a physician's care and the physician must provide a letter stating reasons and duration.
>
>    * * *
>
> 3. Medical leave may be granted for up to six months, with a renewal of

11

>  six months at the option of Syncro management, but in no case can medical leave exceed an associate's length of service. An associate on medical leave with less than one year of service automatically is terminated when his or her time of medical leave exceeds his or her length of service. An associate with one year or more of service will be terminated when his or her time of medical leave exceeds one year.
> 
> * * *

Davis argues that the policy disparately impacts pregnant employees because the six month limit prevents pregnant employees from obtaining the benefits associated with medical leave for the duration of their pregnancies. Davis argues "[b]ecause full term pregnancies always last more than six months, the medical leave policy always has the disparate impact of allowing the termination of 100% of pregnant employees who attempt to take medical leave." *Pl.'s Br.*, at 13.

In response, Syncro first complains that a disparate impact theory was not contained in the pleadings nor suggested at any time prior to Davis's brief in opposition. Syncro suggests that it would be prejudiced if Davis is permitted to argue additional theories this late in the litigation and asks the court to dismiss the claim. Second, Syncro notes that Davis provides absolutely no evidence demonstrating that the policy has a disparate impact on pregnant employees.

The court is inclined to agree with Syncro's first objection to Davis's disparate impact claim, but even if the court overlooked the untimeliness of the argument, Davis's disparate impact claim would fail as a matter of law. First, Davis has presented only argument, not evidence, that the six month limitation on medical leave impacts pregnant employees disproportionately. Second, as shown below, her argument relies on flawed logic.

Davis contends that the policy is discriminatory because it

"allow[s] the termination of 100% of pregnant employees who attempt to take medical leave." This is plainly inaccurate. While the policy may subject to automatic termination women who take leave for all or most of their pregnancies, it does not subject to termination pregnant employees who work for at least one-third of their pregnancies. In short, the policy does not disparately impact pregnant employees, though it may have a greater impact on those who spend over two-thirds of their pregnancy on medical leave.

### Conclusion

The PDA does not require an employer to give preferential treatment to pregnant employees, but it does require the employer to treat its pregnant employees the same as it treats non-pregnant employees. *Armstrong*, 33 F.3d at 1316-17. The facts presented clearly indicate that Syncro made an effort to "work with" some of its employees who required some sort of assistance or accommodation and did not strictly enforce its "no restrictions" work policy in every instance. The PDA obligates Syncro to afford Davis the same sort of leniency and accommodation. A factual dispute exists as to whether Davis was offered that type of leniency, but resolving all inferences in Davis's favor, it appears that she has established a *prima facie* case of disparate treatment and that Syncro is unable to rebut the inference of discrimination on the evidence presented. Insofar as Syncro seeks summary judgment on Davis's claim of disparate treatment, the motion is due to be denied. With respect to Davis's belatedly argued, unsupported, and illogical claim of disparate impact, the motion is due to be granted. An appropriate order denying in part and granting in part Syncro's motion for summary judgment will be separately entered.

DONE this 19th day of April, 1999.

/s/ William M. Acker

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE